IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DAVID A. SCHLEMM,

                                  Plaintiff,                            OPINION AND ORDER

    v.

                                                     21-cv-331-wmc

LARRY FUCHS, LUCINDA BUCHANAN,
JUSTIN S. RIBAULT, JEANIE M. KRAMER,
STEPHEN MURPHY, LORI DOEHLING,
RYAN BLOUNT and MELISSA BLOCK,

                                  Defendants.

Representing himself, state prisoner David Schlemm claims that several prison officials at Columbia Correctional Institution ("CCI") failed to provide adequate medical care for his soy allergy and scar tissue on his foot.  Schlemm was granted leave to proceed on those claims under the Eighth Amendment to the United States Constitution and Wisconsin common law.  After several delays in the case arising out of plaintiff's refusal to sign a medical release, numerous requests for assistance of counsel, motions to stay, a motion to transfer, discovery disputes, recusal requests and attempts at interlocutory appeals, this case proceeded to the dispositive motion stage.  Privately-employed physician Stephen Murphy filed a motion for summary judgment on March 6, 2025 (dkt. #169), and the state employees filed theirs on June 20, 2025 (dkt. #190).  Despite receiving three lengthy extensions of his response deadline (dkt. #183; dkt. #215; dkt. #227), as well as warnings that his most recent deadline of December 23, 2025, was firm and would not be extended absent extraordinarily circumstances, plaintiff has still failed to file *any* materials in opposition to defendants' motions for summary judgment.  Instead, he filed three, additional motions requesting additional time (dkt. #228; dkt. #230; and dkt. #231), as well as his *twentieth* motion for appointment of counsel and an independent expert (dkt. #229).

Plaintiff's most recent motions will be denied. As this court has explained repeatedly to plaintiff, he has not shown that the legal and factual difficulties of litigating this case are beyond his abilities, nor has he shown that his medical issues are so severe as to impede his ability to meet his obligations in this case. This case has been pending for nearly five years, with most of the delays being caused by plaintiff's refusal to prosecute the claims he brought, and plaintiff has now had almost 10 months to respond to defendants' motions for summary judgment, yet he has shown no sign that he intends to do so despite receiving multiple warnings that his deadlines would not be extended again and this case would be resolved without his input. Thus, the court will now resolve the merits of plaintiff's claims.

Plaintiff did not file a response to defendants' summary judgment motions, so the court has accepted the proposed findings of fact that defendants filed in support of their motions as undisputed. Fed. R. Civ. P. 56(e)(2). However, defendants must still carry their burden to show that summary judgment is appropriate. *Johnson v. Gudmundsson*, 35 F.3d 1104, 1112 (7th Cir. 1994). Despite plaintiff's failure to file any opposition materials, the court has taken his unrepresented status into account, reviewed plaintiff's medical records, as well as the evidence he submitted with his earlier motions for injunctive relief, and drawn reasonable inferences in his favor. *See Miller v. Gonzalez*, 761 F.3d 822, 877 (7th Cir. 2014) (At summary judgment, the court must "construe the record in the light most favorable to the nonmovant and avoid the temptation to decide which party's version of the facts is more likely true."); *Anderson v. Hardman*, 241 F.3d 544, 545 (7th Cir. 2001) ("[P]ro se pleadings are held to less exacting standards than those prepared by counsel and are to be liberally construed.") Even applying this generous standard, however, the undisputed facts show that defendants did not violate

plaintiff's rights.  Therefore, defendants' motions for summary judgment will be granted and the case will be dismissed.

UNDISPUTED FACTS

**A.  Background**

Plaintiff David Schlemm is a prisoner at Redgranite Correctional Institution, but at times relevant to this case, he was incarcerated at CCI.  All but one named defendant worked at CCI during relevant times: Larry Fuchs was the warden; Ryan Blount was the Security Director; Lucinda Buchanan was the Health Services Manager ("HSM"); Dr. Justin Ribault and Nurse Practitioner Jeanie Kramer were Advanced Care Providers; Melissa Block was the Assistant Health Services Manager; and Lori Doehling was a nurse (collectively these defendants will be referred to as the "state defendants").  Defendant Stephen Murphy was a privately employed podiatrist and surgeon at Aspirus Divine Savior Hospital located in Portage, Wisconsin.

According to Schlemm's medical records and his treating physicians, beginning as early as July 2015, Schlemm reported having a plantar wart or hardened callus on the tip of his right, third toe.  (July 22, 2015, progress note (dkt. #173-1).)  At that time, Schlemm's DOC health care providers offered instruction on warts in general and on plantar warts in particular.  (*Id.*) From 2015 to 2020, Schlemm and his DOC health care providers continued to diagnose the condition on his third toe as a wart.  (*E.g.*, Sept. 17, 2019, progress note; Feb. 13. 2020 progress note; May 20, 2020 progress note (dkt. #202-1, 16–19).)  However, after a referral to Dr. Murphy, a podiatrist, Schlemm was eventually diagnosed with a type of "hyperkeratotic lesion" on the tip of his third toe known as a "cutaneous horn," which typically has the appearance of

unusual keratinous skin tumors with the appearance of horns.  (Murphy Decl. (dkt. #172) ¶ 22.)  A cutaneous horn is  similar in appearance and size to a plantar wart, which is a small, rough growth usually found on the bottom of the foot or at the base of the toe, and which often presents with a hard, thickened callus.  (*Id*.)  Cutaneous horns have no known cause and are usually small and localized, and often benign – similar to a plantar wart. (*Id.* ¶ 23.)

As for Schlemm's reported soy allergy, his medical records show that he was tested using a Radioallergosorbent test (RAST) for a soy allergy in 2015 while incarcerated at Green Bay Correctional Institution ("GBCI").  (Test results (dkt. #151-7.)  A RAST test is a blood test used to determine the amount of antibodies in the blood for certain allergens, which helps identify if an individual is allergic to something and the severity of the allergy.  Schlemm's RAST test was negative for the antibody used to test for a soybean allergy (IgE), but another antibody (IgG) had a value of 4.01.  (*Id.*)  (Dkt. #202-1, at 150.)  Schlemm's medical records also suggest that medical staff at GBCI interpreted these results as indicating a soy allergy, since his medical records state that he started a "no-soy diet (RAST +)" in October 2015. (Dkt. #151-8.)  According to defendants, however, the original results were misinterpreted, because the positive IgG value was not indicative of a soy allergy. (Kramer Decl. dkt. #198, ¶ 19.)[1]  Indeed, at some point in 2016, GBCI's Health Director reviewed Schlemm's RAST test results, and concluded that the test was negative for a soy allergy.  The Director further wrote to Schlemm to advise that positive IgG antibodies are *not* evidence of a soy allergy, then discontinued his special diet.  (Dkt. #202-1, at 150–151.)

---

[1] *See also "The Myth of IgG Food Panel Testing,"* American Academy of Allergy, Asthma & Immunology, https://www.aaaai.org/tools-for-the-public/conditions-library/allergies/igg-food-test ("The presence of IgG is likely a normal response of the immune system to exposure to food. In fact, higher levels of IgG4 to foods may simply be associated with tolerance to those foods.") (last visited March 5, 2026).

**B. Defendants' Involvement in Treating Schlemm's Medical Conditions at CCI**

**1. Dr. Ribault**

Dr. Ribault was Schlemm's advanced care provider at CCI from July 2019 to July 2020. During this time, Schlemm never raised the issue of a soy allergy or low soy diet. However, Schlemm did complain about his toe problem. At Schlemm's first visit with Dr. Ribault on July 31, 2019, Schlemm showed Ribault what appeared to be a callus or wart on the tip of his third toe. Ribault thought there might be irritation of the wart from Schlemm's shoes, so he ordered a soft shoe medical restriction for Schlemm. *Id*. Schlemm saw Ribault again on September 17, 2019, after Schlemm filed a health service request ("HSR") for wart removal on his foot. Ribault ordered Schlemm salicylic acid to be used to remove the wart. However, the salicylic acid treatment proved unsuccessful, and in February 2020, Ribault used cryotherapy to attempt to remove the wart on Schlemm's toe. The cryotherapy was also unsuccessful.

In May 2020, Schlemm complained to Dr. Ribault about foot pain, and because the prior treatments had been ineffective, Ribault put in a referral for Schlemm to see an offsite foot specialist. Schlemm's offsite podiatry appointment with Dr. Murphy was scheduled for July 21, 2020. After July 28, 2020, Schlemm's primary care responsibility was transferred to APNP Kramer.

**2. Dr. Murphy**

As a result of Dr. Ribault's referral, Schlemm first saw Dr. Murphy on July 21, 2020, on the campus of Divine Savior Hospital. Schlemm reported to Murphy that he had a plantar wart on the third toe of his right foot, which had been frozen on two prior occasions and been causing discomfort for approximately five years. Schlemm told Murphy that the pain in his foot on that date was at a level of "5-6" on a 10-point scale, but he denied any muscular

weakness, loss of strength, or muscle aches. Upon examination, Murphy diagnosed the spot on Schlemm's foot as a "closed hyperkeratotic lesion" (cutaneous horn) measuring 0.9 cm x 0.6 cm x 0.3 cm, although similar in appearance and size to a plantar wart.

After diagnosing the nature of the lesion, Dr. Murphy discussed with Schlemm the diagnosis and potential treatment options, then obtained Schlemm's consent to proceed with an in-office debridement of the lesion with a sharp blade. Following the completion of the debridement, Murphy discharged Schlemm back to the DOC, along with a recommendation that he apply a lactic acid lotion to the affected toe twice weekly, to help exfoliate and hydrate, with the goal of uncovering softer skin. Murphy also provided a gel toe pad to Schlemm to cradle the affected toe and reduce potential pain with walking in the aftermath of the debridement procedure. Finally, Murphy recommended that Schlemm return in 12 weeks for a follow-up appointment.

Schlemm was scheduled to be seen by Dr. Murphy for a follow-up on November 19, 2020, but missed this appointment for reasons that are not clear in the record. The appointment was later rescheduled for December 21, 2020. On that date, Schlemm reported to Murphy that he had had minimal relief from the previous debridement procedure. Upon examination, Murphy noted that the cutaneous horn was roughly the same in size and appearance as it had been at the July 21, 2020, appointment. Murphy discussed potential treatment options and again offered to perform a sharp debridement of the lesion. Murphy also told Schlemm that if the debridement failed, they could consider a different surgical procedure -- an excisional surgery. Murphy further explained that the excisional surgery had inherent risks, would require a surgical assessment for eligibility, and provided no guarantee that it would completely eliminate the lesion, which is why he recommended first attempting

a debridement again. Schlemm consented to the second debridement, after which Murphy provided gel toe caps, as well as recommended that Schlemm receive more lactic acid lotion and non-institutional, supportive shoe gear that would better protect Schlemm's toe. Finally, he recommended that Schlemm return in four months.

The second debridement procedure also proved unsuccessful. However, when DOC transported Schlemm to Divine Savior Hospital on October 12, 2021, to see Murphy, Schlemm refused the appointment, stating that he had a "conflict of interest" because he had filed this lawsuit naming Murphy as a defendant. And when DOC medical providers made subsequent offers to Schlemm to send him to see Dr. Murphy for a follow-up assessment on his foot, Schlemm refused.

Later, Murphy also learned that Schlemm had untreated Hepatitis C, which rendered him ineligible for any more aggressive surgical procedure in any event. In April 2022, after Schlemm had been transferred to a different prison, he was seen by another outside podiatrist, who recommended surgical intervention for Schlemm's toe, but later notified DOC that he would not proceed with any surgical procedures if Schlemm's Hepatitis C remained untreated. (Dkt. #173-12&13.)[2]

### 3. APNP Kramer

APNP Kramer was Schlemm's advanced care provider at CCI from July 28, 2020, to at least February 2022. During this time, she treated Schlemm for complaints about his foot, his alleged soy allergy, and other medical problems. Kramer first saw Schlemm on November 2, 2020, for a complaint about his foot. Kramer ordered a refill of his ammonium lactate topical

---

[2] Plaintiff completed Hepatitis C treatment in October of 2023. (Dkt. #173-20.)

cream for the growth on his foot, which had been recommended by Dr. Murphy, and saw that he had been scheduled for a podiatry follow-up.

On January 20, 2021, Schlemm also saw Kramer about treatment for his Hepatitis C. However, Schlemm refused treatment for Hepatitis C until he was back in the community and his other concerns were addressed, which included a soy-free diet and special medical shoes as recommended by the podiatrist. After the appointment, Kramer ensured that the alternative shoes recommended by podiatry had been entered. (Dkt. #202-1, at 10–11.) However, this was the first time Kramer had heard about a potential soy allergy, so she told Schlemm she would review his chart and get back to him. Kramer reviewed Schlemm's medical history and saw the results of his 2015 RAST test from GBCI, which Kramer interpreted as being negative for a soy allergy.

At his next appointment on February 24, 2021, Kramer offered Schlemm the opportunity to take a new RAST test for soy, but he refused. Kramer also saw Schlemm April 8, 2021, September 13, 2021, November 3, 2021, and December 17, 2021, for complaints related to weight loss and other issues, such as back pain. Schlemm thought his weight loss was due to having soy in his diet, but Kramer did not think so in light of his previous RAST test results. Nevertheless, Schlemm continued to insist he had previous testing showing a soy intolerance, and in November 2021, Kramer ordered a temporary low soy diet for him so she could further investigate.

Ultimately, unable to find any evidence of a soy allergy and, after consulting with a nutritionist at DOC Central Office, APNP Kramer concluded there was no medical reason for Schlemm to have a no soy restriction and discontinued the diet. Kramer was also concerned that his weight loss could be a sign of a serious condition, such as liver disease or hyperthyroid

condition, particularly because of Schlemm's history of Hepatitis C, which can lead to severe liver damage and subsequent weight loss. However, when Kramer attempted to order labs for Schlemm to search for a potential cause of the weight loss, he declined lab testing and was adamant that his weight loss was the result of soy in his diet.

### 4. HSM Buchanan

Buchanan was the HSM at CCI from December 10, 2018, until June 14, 2021. As the HSM, Buchanan's role was largely administrative, meaning she generally did not evaluate, diagnose, determine a course of treatment or prescribe medications for inmates, or have any direct patient care contact with inmates. Thus, as the HSM, Buchanan neither had a say over the diet that Schlemm was on, nor did she have control over the treatment of his foot.

Indeed, based on Schlemm's medical records, HSM Buchanan appears to have had only one interaction with Schlemm relevant to this case. On October 14, 2019, Buchanan noted that she discussed with Schlemm his concerns about his medication and a wart on his foot. In response, Buchanan scheduled him to see his physician, and that follow-up appointment occurred with Dr. Ribault on October 28, 2019.

### 5. Nurse Doehling

Schlemm also saw Nurse Doehling about his foot complaints on May 18, 2021 at a nursing review visit. (Dkt. #202-1, at 114.) Doehling noted a callused area on Schlemm's third right toe with no open or reddened area. She also noted that plaintiff was wearing Nike sports shows in like new condition, and had refused an orthopedic appointment the day before because he did not think different shoes would help him. Finally, she noted that appointments with an advanced care provider and podiatry were scheduled.

9

Based on Schlemm's complaints, Nurse Doehling then approved him for a wheelchair for distances for two months. After two months, however, the wheelchair restriction would need to be reviewed by an advanced care provider because nursing staff can only issue short-term accommodations. Also, Doehling did not approve a wheelchair for all distances because such a restriction is generally reserved for more serious conditions such as paralysis.

On August 13, 2021, Schlemm's wheelchair for distances was continued by Nurse Practitioner Lyon. However, on September 21, 2021, the wheelchair order was sent to Dr. Ribault for review. He then canceled Schlemm's wheelchair restriction because he thought that it was worsening his back pain. According to Ribault, Schlemm's restriction had been based on self-reported pain and a subjective inability to walk that was not medically supported.

### 6. Assistant HSM Block

On August 15, 2021, Schlemm submitted an HSR stating that an advanced care provider had recently told him that he was scheduled for a consultation for a neurology study. The Medical Program Assistance Associate ("MPAA") responsible for scheduling offsite appointments responded to Schlemm's HSR, advising that he did not have an order for an EMG. The MPAA also responded that same day to a second HSR that Schlemm had submitted about an offsite podiatry appointment, advising that his appointment had been scheduled for July 1, but had to be rescheduled.

On August 31, 2021, Schlemm submitted two more HSRs inquiring about his podiatry and neurology appointments, which were forwarded to Assistant HSM Block for her to investigate. Block determined that Schlemm' offsite podiatry and neurology referrals had both been scheduled, but were later canceled by the outside provider. (Cancellation of non-urgent appointments was a frequent occurrence at the time due to the Covid-19 pandemic.) Block

directed the MPAA to reschedule Schlemm's appointments and responded to Schlemm that she was working to get the appointments rescheduled. The podiatry appointment was rescheduled for October 12, 2021, but Schlemm refused to attend. The EMG appointment was rescheduled for December 13, 2021.

### 7.  Warden Fuchs and Security Director Blount

Finally, between April and June of 2021, Schlemm sent four letters related to his medical care to CCI's administration, including CCI Warden Fuchs and Security Director Blount. Schlemm wrote Fuchs a letter dated April 6, 2021, concerning painful scar tissue on his foot. Schlemm asked Fuchs to come see his infected foot. (Dkt. #201-1, at 1–2.) Fuchs responded to Schlemm the same day he received that letter, telling Schlemm that he needed to work with HSU to address his medical concerns. Fuchs also advised Schlemm that he could write to the HSU Manager or, if he had already done that, he could file an inmate complaint, which would be the proper chain of command for medical concerns. In addition, Fuchs advised Schlemm that he could ask his unit supervisors if he needed assistance. (*Id.* at 3.) Fuchs copied all the individuals mentioned in his response, as well as the deputy warden, so everyone would be aware of Schlemm's concerns if they were approached about the situation.

On May 17, 2021, Schlemm also sent an interview/information request to Warden Fuchs about inmate complaints that he had filed regarding medical care for his foot. (Dkt. #200-1, at 4.) Fuchs responded that if he wanted a response about his medical care from HSU, he needed to file an HSR. (*Id.*)

On May 27, 2021, Schlemm next sent an interview/information request to Security Director Blount, asking for security footage from HSU because nursing staff had reported that Schlemm refused treatment in March 2021. (Dkt. #200-1, at 6.) Blount's secretary responded

by asking Schlemm to provide the time, location and people involved so the video could be located. (*Id.*)

Finally, Schlemm sent a letter to Blount, dated June 18, 2021, describing inmate complaints he had filed about his soy allergy and foot problems. (Dkt. #200-1, at 8.) Blount's secretary sent the letter back to Schlemm, asking him to clarify what questions he was trying to pose to Blount in his letter. The record is unclear as to whether Schlemm replied to the secretary's response.


OPINION

Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–07 (7th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). In deciding whether to grant summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party, *Anderson*, 477 U.S. at 255, and construing the filings of unrepresented parties like plaintiff generously, *see Anderson v. Hardman*, 241 F.3d 544, 545 (7th Cir. 2001).

However, summary judgment has been repeatedly referred to as the "put up or shut up" moment for parties seeking to take their claims to trial, at least in the Seventh Circuit. *Johnson v. Cambridge Indus. Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (citation omitted). Specifically, a plaintiff must "do more than simply show that there is some metaphysical doubt as to the

material facts"; he must respond to defendants' showing of a lack of material disputes of fact by designating specific facts in affidavits, depositions, answers to interrogatories or admissions that establish there is a genuine triable issue. *Anderson*, 477 U.S. at 256-57, 261.  Here, plaintiff failed to respond *at all* to defendants' arguments or proposed findings of fact.  As discussed, the court has nonetheless reviewed plaintiff's medical records and the evidence he submitted with his motions for preliminary injunctive relief.

Plaintiff brings his claims under the Eighth Amendment and Wisconsin negligence law. The Eighth Amendment's prohibition on cruel and unusual punishment prohibits prison officials from acting with "deliberate indifference" to prisoners' serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976); *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014).  To prevail on a claim under the Eighth Amendment, plaintiff must show that: (1) he has an objectively serious medical condition; and (2) defendants acted with deliberate indifference to that condition.  *Chatham v. Davis*, 839 F.3d 679, 684 (7th Cir. 2016); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011).

As for plaintiff's negligence claims, the following elements apply:  (1) a breach of (2) a duty owed (3) that results in (4) an injury or injuries, or damages. *Paul v. Skemp, 2001 WI 42, ¶ 17.*

## I.     Serious Medical Need

The first element of plaintiff's Eighth Amendment claim, an objectively serious medical condition, is one that a doctor recognizes as needing treatment or one for which the necessity of treatment would be obvious to a lay person.  *Pyles,* 771 F.3d at 412.  Defendants argue that plaintiff has not shown that either his alleged soy allergy or toe problem qualified as an objectively serious medical condition.  The court agrees with respect to plaintiff's alleged soy

allergy. There is no evidence in plaintiff's medical records or otherwise establishing that he has a soy allergy, much less one that that requires a special diet. As both APNP Kramer and the health director at GBCI explained, the single RAST test on which Schlemm relies actually showed that he was *not* intolerant to soy. Further, while Schlemm alleges that he was suffering from weight loss and other digestive issues, he also repeatedly refused testing to determine the actual cause of those health issues. In short, there is nothing in the record from which a reasonable jury could conclude that plaintiff's alleged soy allergy was an objectively serious medical condition.

Whether plaintiff's toe lesion presented an objectively serious medical condition is a closer question. As defendants point out, some courts have concluded that calluses and warts do not constitute a serious medical need. *E.g.*, *McCrary v. Godwin*, No. CV 2:23-00334-TFM-N, 2024 WL 5329918, at *7 (S.D. Ala. Dec. 6, 2024) ("foot calluses and plantar warts" were "not objectively serious medical needs" where plaintiff "never presented with foot swelling, redness, or signs or symptoms of infection"); *Whitfield v. O'Connell*, No. 09 CIV. 1925 (WHP), 2010 WL 1010060, at *8 (S.D.N.Y. Mar. 18, 2010), *aff'd*, 402 F. App'x 563 (2d Cir. 2010) ("Warts do not constitute a serious medical need under the Eighth Amendment.") Similarly, the Seventh Circuit has explained that a prison officials' refusal to treat "the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue -- the sorts of ailments for which many people who are not in prison do not seek medical attention -- does not by its refusal violate the Constitution." *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996). That being said, plaintiff's toe lesion was eventually diagnosed as a hyperkeratotic lesion; he reported that the lesion caused him pain and discomfort; and the issue was serious enough that Dr. Murphy and other providers considered performing surgery to address it. Thus, the court will

assume for purposes of summary judgment that plaintiff's toe lesion was an objectively serious medical condition.

## II.    Deliberate Indifference and Negligence Claims

Turning to the second element, however, an official's deliberate indifference relates to the official's subjective state of mind. *Perez v. Fenoglio*, 792 F.3d 768, 776-77 (7th Cir. 2015); *Arnett*, 658 F.3d at 750. Plaintiff must show that each defendant knew of and disregarded a substantial risk of harm. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016); *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015). In cases such as this one, in which a prisoner acknowledges that he received *some* treatment for his medical condition, but claims the treatment was inadequate, the relevant question is whether the medical provider's actions were "such a substantial departure from accepted professional judgment, practice, or standard, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261-62 (7th Cir. 1996).

Medical providers violate the Eighth Amendment if they prescribe a course of treatment without exercising medical judgment or prescribe treatment that they know will be ineffective. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662-63 (7th Cir. 2016). Thus, it is not enough for plaintiff to show that: he personally disagrees with a defendant's conclusions about the appropriate treatment, *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); other medical providers reached a different conclusion about what treatment to provide plaintiff, *Pyles*, 771 F.3d at 409; or even that defendants could have provided *better* treatment, *Lee v. Young*, 533 F.3d 505, 511-12 (7th Cir. 2008). Rather, plaintiff must offer sufficient evidence for a reasonable jury to find that defendants' medical judgment was "so significant a departure from accepted professional standards or practices that it calls

into question whether [that provider] actually was exercising his [or her] professional judgment." *Pyles*, 771 F.3d at 409.

Here, most of the defendants did not even treat plaintiff's toe problem, but rather appropriately passed it on to an advanced medical practitioner with the skills and knowledge to address his medical need -- in this case, that was Dr. Murphy, who as a podiatrist attempted twice to administer a solution to what turned out to be a lesion, albeit unsuccessfully, and then ran into a roadblock of plaintiff's creation: first by refusing to see Dr. Murphy for a follow-up appointment and then refusing treatment for Hepatitis C.

For these reasons, plaintiff cannot met his burden to show that any defendant acted with deliberate indifference to his need for treatment of his lesion, nor that any defendant's action fell below a relevant medical standard of care.[3]

### A.  Dr. Ribault and APNP Kramer

Specifically, plaintiff contends that Dr. Ribault violated his rights under the Eighth Amendment and state negligence law by refusing to reinstate his soy-free diet and failing to treat the scar tissue on his foot.  Similarly, plaintiff sued APNP Kramer based on her failure to reinstate his soy-free diet and her alleged cancellation of his crutch and wheelchair restrictions. As already discussed, plaintiff provided no evidence that he has a soy allergy.  Moreover, Kramer offered to retest him for a soy allergy or provide other testing to determine the cause of his weight loss and digestive issues, but he refused.  As such, her actions with respect to

---

[3] Because the court is resolving plaintiff's Eighth Amendment and negligence claims on the merits, the court need not consider defendants' other arguments in support of summary judgment, including qualified immunity, discretionary immunity and inadequate notice of claim as to some of the negligence claims.

plaintiff's alleged soy allergy were not deliberately indifferent or negligent. *See Jackson v. Matushak*, No. 20-C-1341, 2022 WL 19693712, at *13 (E.D. Wis. May 26, 2022) ("The plaintiff cannot 'engineer' a claim of deliberate indifference out of his refusal to accept reasonable medical treatment."); *aff'd sub nom. Jackson v. Peters*, No. 22-2514, 2023 WL 3151110 (7th Cir. Apr. 28, 2023). As for Ribault, the medical records show that Ribault never saw plaintiff for a soy related complaint.

With respect to plaintiff's toe lesion, the medical records show that Dr. Ribault treated plaintiff for what both plaintiff and he believed was a wart. After various methods to remove the wart were ineffective, Dr. Ribault referred plaintiff to an outside specialist. Thus, no reasonable jury could conclude that Ribault failed to exercise medical judgment in his treatment decisions, even if a podiatry specialist later determined that the lesion was not a wart and used a different type of treatment. *See Pyles*, 771 F.3d at 409 ("Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation."). Nor is there any evidence in the record suggesting that Dr. Ribault's actions fell below the standard of care for a reasonable primary care physician.

Finally, the record shows that APNP Kramer was not the person who discontinued plaintiff's crutch and wheelchair restriction. Rather, Dr. Ribault canceled those restrictions because he concluded they were not only medically unnecessary but likely worsening plaintiff's back pain. Moreover, plaintiff has provided no evidence to refute Ribault's legitimate exercise of his medical judgment, so defendants Kramer and Ribault are entitled to summary judgment on the claims against them.

### B.  Dr. Murphy

17

Plaintiff's claims against Dr. Murphy are based on the two office appointments he had during which Murphy examined, diagnosed and ultimately performed a debridement procedure on plaintiff's toe. Plaintiff challenges Murphy's decision to perform the debridement, particularly the second one, after the first was unsuccessful. However, plaintiff's claim again fails for lack of evidence. Specifically, plaintiff offers no evidence that Murphy's treatment was unreasonable, let alone negligent, grossly negligent or deliberately indifferent. To the contrary, the *only* evidence in the record shows that Murphy used his professional judgment in treating plaintiff. "By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment." *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016); *see also Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996) ("Medical decisions that may be characterized as 'classic example[s] of matter[s] for medical judgment,' *Estelle*, 429 U.S. at 107, such as whether one course of treatment is preferable to another, are beyond the [Eighth] Amendment's purview."). Moreover, when a different podiatrist later offered a surgical procedure to treat the lesion on plaintiff's toe, as originally offered by Murphy and refused by plaintiff, that doctor subsequently rescinded the offer when he learned that plaintiff had untreated Hepatitis C. As Dr. Murphy explains in his declaration, "In my professional judgment as a board-certified Doctor of Podiatric Medicine and as a surgeon, it would have been dangerous and contrary to the standard of care to have proceeded with any excisional surgical procedure upon Mr. Schlemm's right foot at any time in the face of untreated hepatitis C." (Dkt. #172, ¶ 69.) Plaintiff has submitted no evidence to refute this, so Murphy is entitled to summary judgment on both plaintiff's Eighth Amendment and negligence claims against him.

### C.  HSM Buchanan, Nurse Doehling and Assistant HSM Block

Plaintiff also contends that:  HSM Buchanan refused to treat his foot scar tissue; Nurse Doehling failed to refer him to a doctor for his foot and only gave him a temporary, distance wheelchair restriction; and Assistant HSM Block did not respond to his request to schedule an off-site neurology consult.  However, plaintiff's medical records refute these allegations as well.

To begin, as already alluded to, none of these three defendants was plaintiff's direct, advanced care provider, nor could they prescribe medication, order off-site appointments or overrule an advanced care provider's decision.  In addition, nurses cannot generally be found liable for deliberate indifference or negligence for relying on a doctor's medical judgment. *Pulera v. Sarzant*, 966 F.3d 540, 552–53 (7th Cir. 2020); *see also Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1075 (7th Cir. 2012) ("[N]urses may generally defer to instructions given by physicians" unless "it is apparent that the physician's order will likely harm the patient.").

Turning to plaintiff's specific claims against Buchanan, the record shows that plaintiff had only one relevant interaction with Buchanan related to his foot in October 2019.  On that occasion, plaintiff complained about his foot and Buchanan promptly referred him to a physician.  This alone neither supports a claim of deliberate indifference nor of negligence.  Rather, it shows that Buchanan relied on plaintiff's advanced care providers to treat him, which she was entitled to do.

As for Nurse Doehling, plaintiff's claim that she refused to schedule treatment for his foot after meeting her on May 18, 2021, is directly refuted by his medical records.  Instead, at that appointment, Doehling noted that plaintiff was scheduled to be seen by an advanced care provider.  He was seen again by a nurse on August 6, 2021, and APNP Kramer in September.

Further, he was scheduled to see Dr. Murphy in October 2021, but he refused that appointment. Although there was some delay between appointments to address his toe lesion, "[h]aving to wait before seeing a doctor for a non-emergency situation is not deliberate indifference; it is a fact of life, inside and outside of prison." *Williams v. Tannan*, No. 20-CV-1659-PP, 2022 WL 1620347, at *5 (E.D. Wis. May 23, 2022).

In addition, the record also shows that Nurse Doehling's decision to issue plaintiff a wheelchair for distance restriction was based on her limited authority to enter only temporary, distance wheelchair restrictions, as well as on her medical judgment. In her notes, Doehling wrote that she observed a callused area on plaintiff's toe that was not red or open, with no indication that she believed a more substantial wheelchair accommodation was medically necessary. She also noted that an advanced care provider would review her recommendation. Thus, no reasonable jury could conclude that Doehling's actions were negligent or deliberately indifferent.

As for plaintiff's allegations against Assistant HSM Block, his claim that she failed to respond to a request for a neurology appointment is also contradicted by the record. The record actually shows that when Block became aware of issues with plaintiff's neurology appointment, she immediately investigated the issue, told the MPAA to reschedule the appointment, *and* wrote to plaintiff that he would be rescheduled. Again, Block's prompt actions were not negligent or deliberately indifferent. Thus, the court will grant summary judgment on plaintiff's claims against Buchanan, Doehling and Block as well.

### D. Warden Fuchs and Security Director Blount

Finally, plaintiff's claims against Warden Fuchs and Security Director Blount are based on the letters he wrote to them about his medical issues. However, Warden Fuchs responded

appropriately to the letters by directing plaintiff to work with HSU through the proper chain of command.    As for Security Director Blount, the record shows that he never actually saw the letter or interview/information request sent by plaintiff, so he cannot be held liable for his failure to respond.  *See Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) ("Individual liability under [42 U.S.C.] § 1983 . . . requires personal involvement in the alleged constitutional deprivation." (alteration adopted)).    Moreover, Blount's secretary -- who did respond to plaintiff's first correspondence by asking for more details about the camera footage he was requesting, and to the second by asking him to clarify what questions he intended Blount to respond -- provides no basis for fault, much less for a finding of deliberate indifference or negligence.

In short, neither Fuch's nor Blount's office's responses reflect negligence or deliberate indifference.  Rather, these responses were reasonable and appropriate, as neither Fuchs nor Blount were responsible for inmate medical care.  Nor could they have ordered specific treatment for plaintiff or been in the position to evaluate whether the treatment he was receiving was proper.  Thus, it was appropriate for them to defer to the treatment decisions of plaintiff's medical providers, and Fuchs and Blount are entitled to summary judgment as well. *See Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008) ("The policy supporting the presumption that non-medical officials are entitled to defer to the professional judgment of the facility's medical officials on questions of prisoners' medical care is a sound one.").

ORDER

IT IS ORDERED that:

21

1) Plaintiff David Schlemm's motions for further extension of time (dkt. #228, dkt. #230, dkt. #231) and motion for appointment of an independent expert and counsel (dkt. #229) are DENIED.

2) The motions for summary judgment filed by defendants Stephen Murphy (dkt. #169) and the state defendants (dkt. #190) are GRANTED.

3) The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 10th day of March, 2026.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge